Filed 7/19/24  Adventure Church v. City of Fresno CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ADVENTURE CHURCH, INC.,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF FRESNO,<br><br>Defendant and Respondent. | F086428<br><br>(Super. Ct. No. 22CECG04022)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

Lurie & Kramer, Barak Lurie and Luke Manzo for Plaintiff and Appellant.

Tucker Ellis, Matt J. Fletcher, Douglas A. Hedenkamp; Aleshire & Wynder and Anthony R. Taylor for Defendant and Respondent City of Fresno.

-ooOoo-

Plaintiff Adventure Church, Inc. (Adventure Church or the church) sued defendant City of Fresno (city) for, among other things, intentional interference with contractual relationship (the interference claim).  The city responded by filing an anti-SLAPP motion

pursuant to Code of Civil Procedure section 425.16,[1] seeking to strike the interference claim. The city contended its acts of alleged interference arose from protected activity and the church could not establish a reasonable probability it would prevail on the claim because (1) the claim was barred by the Government Claims Act (Gov. Code, § 900 et seq.) and the church did not allege any statutory authority for municipal liability, (2) the church did not have a valid contract as the contract expired on its own terms, was rescinded by mutual mistake, was impossible to perform, and was cancelled by the church, (3) the city did not intend to interfere with the contract, and (4) the city's acts did not cause a breach of the contract.

The trial court granted the motion to strike. The trial court found the interference claim could not be based on any acts of alleged interference that occurred after March 31, 2021, because the contract expired on that date, and the claim based on acts that occurred prior to that date arose from protected activity. The trial court further found the church had not demonstrated a likelihood of prevailing on the merits as the church could not demonstrate a valid contract after March 31, 2021, or a breach of that contract after that date. Moreover, to the extent the claim was based on the acts that occurred prior to the contract's expiration, the claim was time-barred, and the city was immune from liability because those acts involved planning level decisions by executive and legislative bodies or their representatives or employees.

On appeal, the church contends the challenged conduct that forms the "gravamen" of the interference claim is not subject to the anti-SLAPP statute because it is illegal conduct. The church further contends it met its burden of demonstrating a likelihood of

---

[1]    A "SLAPP" is a strategic lawsuit against public participation and a special motion to strike under Code of Civil Procedure section 425.16 is referred to as an anti-SLAPP motion. (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1007, fn. 1 (*Bonni*).) Undesignated statutory references are to the Code of Civil Procedure.

prevailing on the merits because: (1) the contract did not expire since the other party to the contract waived the time for performance; (2) it could prove the elements of the claim; (3) there was no mutual mistake or rescission of the contract; (4) the purported rescission took place after the city interfered; (5) performance was not impossible; (6) the city can be liable for the tortious interference of its council members; and (7) the church complied with the Government Claims Act.

Based on our independent review of the record, we conclude: (1) the claimed acts of interference were protected activity; and (2) the church failed to carry its burden of showing a reasonable probability it would prevail on the interference claim because the contract on which the claim is based expired by its terms on March 31, 2021, and the other party to the contract did not waive the time for performance. We therefore affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2020, Adventure Church and Tower Theater Productions for the Performing Arts (Tower Theater Productions) executed a written purchase contract whereby Adventure Church would acquire property located at 777-815 E. Olive Avenue (the Tower property) in Fresno for $3.9 million (the purchase contract), which includes the Tower Theatre and Sequoia Brewing, a stand-alone commercial building on a portion of the larger parcel (the brewery premises).[2] The purchase contract included a time is of the essence provision and a requirement that all amendments be in a writing executed by the buyer and seller. The purchase contract was amended on October 7, 2020, to include

---

[2] Laurence Abbate, Tower Theater Properties' chief financial officer, signed for Tower Theater Productions. Although the purchase contract only lists Tower Theater Productions as the selling party, the first amended complaint alleges that the seller was both Tower Theater Productions for the Performing Arts and Tower Theater Productions, which is a general partnership. We refer to the seller of the Tower property collectively as the Tower owners.

the adjacent parcel located on 1247 N. Wishon Avenue, on which sat a Me-N-Ed's restaurant, and to change the purchase price to $4.815 million.[3]

Prior to signing the purchase contract, Adventure Church was provided a copy of a lease between J&A Mash & Barrel, LLC (J&A), doing business as Sequoia Brewing Company, and Tower Theater Properties, Inc.,[4] which included an option to purchase the brewery premises if the landlord offered it for sale to an unrelated third party.[5]

Abbate, on behalf of Tower Theater Productions, represented in a property information sheet provided in connection with the purchase contract that Tower Theater Productions had "no actual knowledge of any encumbrances, covenants, conditions, restrictions, easements, licenses, liens, charges or other matters which affect the title of the Property," and "no actual knowledge of any options to purchase, rights of first refusal, rights of first offer or other similar agreements affecting the Property."

The purchase contract was amended an additional seven times in writing, six of which extended the escrow closure date. That date was first extended to December 12, 2020, then to January 15, February 12, February 23, and February 26, 2021. The sixth amendment dated February 11, 2021, which extended the closing to February 23, 2021, required Adventure Church to deposit a $793,500 down payment into the escrow account within two business days. As the close of escrow neared in January 2021, the church

---

[3]     We refer to the property located at 777-815 E. Olive Avenue and the property located at 1247 N. Wishon Avenue collectively as the Tower property.

[4]     Tower Theater Properties, Inc., is one of two partners in Tower Theatre Productions, a California general partnership.

[5]     The lease was originally between Tower Theater Properties, Inc., and Craig Scott Kendall and Michele Kendall, doing business as Sequoia Brewing Company Bar & Grill, but the Kendalls assigned the lease to J&A in March 2020 with the consent of Tower Theater Properties, Inc.

learned Abbate and the Tower owners may have failed to fully disclose the sale to J&A or obtain a waiver of J&A's potential right to acquire the leased premises.

*Sequoia Brewing Lawsuit*

On February 16, 2021, J&A filed a complaint for breach of contract against Tower Theater Properties and added Adventure Church as a defendant the following day. On February 22, 2021, J&A recorded a lis pendens. Two days later, the superior court granted J&A a temporary restraining order to halt the sale of the property, issued an order to show cause, and set a March 17, 2021 hearing on J&A's request for a preliminary injunction.

On March 3, 2021, Adventure Church and Tower Theater Productions signed an eighth amendment to the purchase contract which extended the close of escrow to March 31, 2021, and provided that $15,000 of the church's deposit would be released to the seller, which was nonrefundable but applicable to the purchase price. The $15,000 payment was compensation for the Tower owners' attorney fees.

On March 17, 2021, the superior court denied J&A's request for a preliminary injunction and ordered the lis pendens expunged. (*J&A Mash & Barrel, LLC v. Superior Court* (2022) 74 Cal.App.5th 1, 14 (*J&A Mash & Barrel*).) J&A sought relief from the superior court's orders by filing a petition for writ of mandate with this court. (*Ibid.*) On March 30, 2021, we issued a temporary stay and after informal briefing, we issued an alternative writ on April 23, 2021, directing the superior court to either vacate its ruling expunging the lis pendens or show cause why relief should not be granted. (*Ibid.*)

On April 26, 2021, the superior court vacated its ruling and set a briefing schedule and hearing date for Tower Theater Production's motion to expunge the lis pendens. (*J&A Mash & Barrel*, *supra*, 74 Cal.App.5th at p. 14.) On July 7, 2021, the superior court granted the motion to expunge the lis pendens. (*Id.* at p. 15.) On July 27, 2021, J&A filed a petition for writ of mandate with this court (the J&A writ proceeding). After

informal briefing was provided, we issued an order to show cause on October 12, 2021. (*Ibid.*)

### *The Church and Tower Owners Continued Negotiations*

While the J&A action was ongoing, the church and the Tower owners discussed possible alternatives to complete the sale. A meeting was held on March 25, 2021, attended by Abbate, Adventure Church's real estate agent Bill Richardson, and pastor Anthony Flores, in which they discussed the impediments to the church's ability to close escrow on the purchase contract and alternatives to the purchase contract. Richardson confirmed the discussion in an e-mail and listed the alternatives, including cancelling the current escrow and starting a new escrow whereby the church would purchase a nearly 50 percent interest in the Tower Theater Properties corporation and thereby obtain ownership of the Tower Theatre.

On March 30, 2021, the Tower owners' attorney e-mailed the church's attorney stating the Tower owners would not extend the next day's closing date and if the church wanted to leave its money sitting in escrow, that was their choice, but if they wanted out, the Tower owners would sign a simple escrow instruction directing the title company to close the account and refund all refundable money required by the purchase contract. The church did not deposit the remaining purchase money into escrow or provide a proof of funds, including underwriting approval from its lender.

On March 31, 2021, Richardson e-mailed Abbate and Flores with three options: (1) do nothing, go to court, win the appeal and continue with the current escrow; (2) sign a memorandum in which the church buys close to 50 percent of the shares in the entity that owns the Tower Theatre, cancel the current escrow, and begin the process to split the parcel; or (3) cancel the current escrow and enter into a new agreement to buy the Tower Theatre.

In mid-April 2021, the general counsel of The Foursquare Church discussed the situation with the church's attorney and personnel, including Flores, including the church's request for a loan. After the phone meeting, the general counsel sent an e-mail to Flores and other church personnel that recapped pertinent parts of the conversation, including that the church was keeping the purchase agreement in place for continuing negotiation purposes and to maintain leverage in the situation, but the expectation was that the purchase contract would be cancelled in exchange for a new deal. Richardson reviewed the e-mail and confirmed this was accurate.

On April 22, 2021, Abbate was interviewed on a KMJ radio podcast. Abbate stated the sale was "on hold" and "frozen." Abbate explained: "Contract has expired, you know, like real estate contract, that has expired, but it doesn't really mean anything because whenever a judge steps in and says hey, I'm putting this on hold, that doesn't really mean anything. Everything else just goes away. You have to wait until the court system works its way out. Of course the superior court saw it our way and ruled for us … [¶] [b]ut then you can appeal. That's what they've done. We're just waiting on this appeal. We're kind of frozen. The contract is frozen … if we give us the go ahead, we still continue probably. I don't see any way. You know, they've done everything. We've done everything. There's just been this discussion and what I call kind of a stall technique, you know, to prolong this thing." The intention was still for the church to buy the Tower Theatre.

On April 23, 2021, Abbate stated during an interview with GV Wire on Facebook Live that he intended to "[f]inalize this transaction, if we can." Abbate confirmed the escrow with Adventure Church had ended "[a]s far as the contract on paper," and "[i]t has crossed that term, but it really was frozen" due to the legal proceedings. Abbate further stated, "the contract has lapsed but only because they have made it so it can go right back on, is my understanding, so we're continuing forward." Abbate confirmed the

7.

church was still interested in buying and he was still interested in selling. Abbate did not believe he could consider an offer from another group because "we're in the contract," but it was "a gray area that everybody's discussing" which he would leave to the attorneys. He believed it was "going to just continue on" and it was "new for us to figure out how to get through these hurdles."

In an interview with Oreo Express around the same time, Abbate stated that they were "trying to figure out an alternate path as far as the sale is concerned." Abbate explained that there were no other offers when he received the church's offer, and he did not want to tell anyone about the sale until he "got through all the hurdles of the sale." Once those hurdles cleared, he disclosed the sale, the media found out, and "all kinds of offers ended up coming in," but at that point he was in escrow and "[y]ou got to legally stay in with them. It's the right thing and legal. That's what you have to do."

At the end of April 2021, the Tower owners' attorney e-mailed a confidential settlement communication to the church's attorney as a follow-up to a conversation. The attorney stated that as he explained in the conversation, "even though the contract expired by no fault of my client, it appears that my client remains willing to explore options for completing the sale to your client." The attorney further stated that because the brewery was not going away and wanted to buy the entire property, it appeared the Tower owners would be locked in litigation for quite some time and his client was not inclined to continue the "costly battle" unless the church was willing to pick up the costs.

Accordingly, the Tower owners proposed, among other things, that: (1) the church would file the motion to expunge; (2) the Tower owners would commence the subdivision process to split the theater, restaurant, and brewery into three separate parcels, with the parties sharing the costs as specified and the subdivision being completed within one year and if not, "then the contract—described below—shall be canceled and each party shall cooperate in the close of escrow and release all claims

8.

against each other"; (3) the Tower owners "will terminate the current contract and escrow, with both parties releasing all claims related to the current contract and escrow" and they would "sign a new contract pursuant to which we sell the theater to the church once the subdivision is complete"; and (4) the parties would cooperate in the litigation, with the church paying the Tower owners' legal fees in defense of the J&A action, as the only reason the Tower owners would continue to fight the action would be to protect the church's interest in buying the property.

The church's attorney responded, agreeing to some terms, and offering counterproposals to others. As pertinent here, the attorney stated Adventure Church would agree to cover the Tower entities' legal fees "from the date the new deal is executed."

On May 5, 2021, Abbate and Richardson exchanged e-mails with additional thoughts concerning what Abbate called the "new agreement." Richardson stated that "[o]nce we cancel escrow both parties will have items to pay." According to Abbate, the discussions were designed to reach a new deal with completely different terms than those agreed to under the purchase contract. On May 14, 2021, Richardson sent "the written agreement from the attorneys" to Abbate, with a copy to Flores, for his review, along with "a purchase sales agreement that we will have between both parties." According to Abbate, the agreement was in lieu of the original purchase contract.

On June 8, 2021, Richardson e-mailed Abbate and another individual, with a copy to Flores, with a list of items as a follow-up to a conversation they had. Richardson believed they had a window between the J&A hearing on June 15, 2021, and the city's hearing on July 8 "to be able to get it closed." The items included, among other things, amending the current contract to increase the sales price to $5 million, including specific down payment and financing terms, and having the church take on all expenses, liabilities, and attorney fees. On June 11, 2021, Richardson sent another e-mail to

9.

Abbate, with a copy to Flores, which discussed another alternate deal structure for the sale. An unsigned written ninth amendment to the purchase contract included revised terms such as the increased purchase price, the buyer's obligation to subdivide and parcel split the brewery premises and pizza restaurant, and that escrow would close on July 8, 2021.

On July 20, 2021, Abbate e-mailed Flores and stated that he preferred to terminate the escrow because the original deal expired but the brewery litigation was continuing, and the Tower entities were not going to sell the brewery premises to the church while the brewery lawsuit was ongoing.

### *The City's Eminent Domain Proceedings and the Appeal in the J&A Writ Proceeding*

Meanwhile, on June 30, 2021, the city filed an action against Tower Theater Properties and sought an order permitting inspection of the Tower Theatre pursuant to section 1245.010, which allows "any person authorized to acquire property for a particular use by eminent domain," such as the city,[6] to "enter upon property to make … appraisals or to engage in similar activities reasonably related to acquisition or use of the property for that use." (§ 1245.010.)

On October 13, 2021, the superior court granted the city's motion for an order permitting entry into the Tower Theatre so the city could assess whether the historical components were being preserved adequately and to complete an appraisal. The city subsequently had an appraisal conducted.

The appeal in the J&A writ proceeding was decided in January 2022. At the January 12, 2022 oral argument, Tower Theater Productions' attorney represented the purchase contract with the church was expired and null and void. A week later we published our opinion in which we found the order expunging the lis pendens was

---

[6] Government Code section 37361, subdivision (a) permits a legislative body to "acquire property for the preservation or development of a historical landmark."

10.

flawed, as it was based on erroneous legal rulings and factual findings not supported by substantial evidence, and J&A had shown the probable validity of its real property claims. (*J&A Mash & Barrel*, *supra*, 74 Cal.App.5th at pp. 10, 42.) Accordingly, we concluded J&A was entitled to the continued recordation of the lis pendens pending the outcome of the litigation and issued a writ directing the superior court to vacate the order granting Tower Theater Productions' motion to expunge lis pendens and enter a new order denying the motion. (*Id.* at pp. 42–43.)

We also concluded J&A was entitled to recover its attorney fees based on our finding that Tower Theater Productions did not act with substantial justification in moving to expunge the lis pendens and other circumstances did not make imposing attorney fees unjust as a matter of law. Consequently, we directed the superior court to hold further proceedings to determine J&A's reasonable attorney fees and costs. (*J&A Mash & Barrel*, *supra*, 74 Cal.App.5th at p. 43.)[7]

The city was required to engage in good faith negotiations with the Tower Theatre's owner before a resolution of necessity could have been presented to the city council for a vote on whether to exercise eminent domain.[8] Consequently, on February 2, 2022, in a confidential settlement letter from the city's outside counsel, the city extended an offer to purchase the Tower Theatre and brewery premises for $4.025 million in cash. The city proposed the offer to resolve all issues in both the city's action and the J&A litigation, subject to city council approval, which would include the resolution of all disputes regarding the property's sale by the applicable parties, including

---

[7] The church asserts the Tower owners were ordered to pay J&A more than $40,000 in attorney fees.

[8] Government Code section 7267.1, subdivision (a) provides: "The public entity shall make every reasonable effort to acquire expeditiously real property by negotiation."

any prior buyer.  The city sent copies of the offer to counsel for the church and Sequoia Brewing.

### The Church Sues the Tower Owners

On February 8, 2022, Adventure Church sued the Tower owners for breach of contract seeking specific performance of the purchase contract.  The church alleged that the Tower owners breached the purchase contract by:  (1) refusing to close escrow; (2) representing to this court at oral argument in the J&A writ proceeding that the purchase contract had "expired and is of no force and effect"; and (3) refusing to provide clear title as evidenced by the cloud on title created by J&A's recorded claim of right and notice of pendency of action.

Abbate testified in his deposition that before this lawsuit, he was willing to sell the Tower Theatre to the church, but he changed his mind after this lawsuit was filed and he no longer wanted anything to do with the church.  According to Abbate, the decision not to sell the property to the church was set in stone once the lawsuit was filed.

In March 2022, the city, the Tower owners, J&A, the church's representatives, and the parties' attorneys, participated in a mediation.  All offers the city made during the mediation were to settle the pending litigation matters and to prevent contemplated litigation over ongoing disputes under eminent domain law.

### City Council Approval of the City's Purchase of Tower Theatre

On April 21, 2022, the city council considered and ultimately adopted a resolution to purchase the Tower property.[9]  The recitals in the resolution stated, among other

---

[9]     Flores declares that he appeared before the city council on April 21, 2022, and told the council the church was still under contract to purchase the Tower Theatre.

While Richardson declared on information and belief that the city entered into a deal or agreement with the Tower owners to purchase the Tower Theatre sometime between January and May 2022, the city's outside counsel declared that the city council

12.

things, that the city council found the purchase contract expired on March 31, 2021, without the church depositing the full purchase price into escrow, and the fair market value of the Tower property was at least $6.5 million. The city council approved two purchase and sale agreements by which the city would purchase the Tower property for $6.5 million and Sequoia Brewery would buy its portion of the property for a net purchase price of $950,000. The city council authorized the city manager to enter into a joint defense and indemnity agreement with the Tower Theatre and Sequoia Brewery for potential litigation by the church to contest the city's purchase of the Tower Theatre property.

On May 19, 2022, the Tower owners' attorney directed the title company to close the escrow on the purchase contract. The attorney explained that it was unnecessary to execute mutual escrow cancellation instructions because the escrow was required to be terminated the prior year pursuant to Section 8.7 of the purchase contract. The attorney asserted the escrow must be cancelled for three alternative reasons: (1) the purchase contract was void due to mutual mistake and, as a result, the Tower owners returned $15,000 to escrow so it could be returned to the church with the remaining deposits and the escrow should be terminated, cancelled, or closed;[10] (2) the escrow should have been terminated in 2021 pursuant to Section 8.7 of the purchase contract because certain buyer's contingencies were not satisfied and had not been waived; and (3) the parties expressly agreed in an amendment that escrow shall close on or before March 31, 2021,

_____

did not make a binding offer or commitment to the Tower owners to purchase the Tower Theatre until the April 2022 council meeting.

[10] Third party deposit escrow instructions from the title company show the title company wired $15,000 to the city's trust account and instructed the city to apply the funds for the benefit of Tower Theater Productions, a California general partnership, and use the funds as the return of the funds that were released to Tower Theater Productions on March 3, 2021, which were to be returned to the church.

13.

and since the transaction was not consummated by that date, the Tower owners had no further obligation to the church to complete the sale.

The escrow on the city's purchase of the Tower property closed on July 22, 2022.

On July 27, 2022, the church signed escrow cancellation instructions which directed the title company to return $831,000 held in escrow to the church. The parties agreed the purchase contract was cancelled in its entirety. When the title company closed the escrow account, its records showed the church received all the funds it deposited, including the $15,000 that the Tower owners withdrew.

### The Government Claim Process

Meanwhile, on May 3, 2022, the church presented a claim for damages to the city alleging the city interfered with the church's purchase contract for the Tower property. On May 20, 2022, the city sent a notice of insufficiency of the claim to the church's attorney notifying him the claim was being returned without action because it failed to include certain information required by Government Code section 910, such as the date, place, and other circumstances of the occurrence that gave rise to the claim.

The church submitted an amended claim to the city on June 3, 2022, to address the inadequacies in the original claim, but the city sent a notice of insufficiency of the claim and returned the claim without action because it again failed to include information about damages as provided in Government Code section 910, subdivision (f). The church submitted another amended claim on June 24, 2022, which removed the reference to a dollar amount and denoted it was an unlimited civil matter. The city rejected the amended claim on July 21, 2022.

On November 1, 2022, the church's attorney submitted a final amendment to the church's claim alleging July 22, 2022, as the date the city closed escrow on the Tower property. The city rejected the amended claim on November 16, 2022.

14.

## *This Lawsuit*

On December 15, 2022, Adventure Church filed a complaint against the city and Terance Frazier, which alleged seven causes of action, including intentional and negligent interference with contractual relationship, retaliatory eviction, and violations of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc et seq. The intentional interference claim alleged the city intentionally induced the Tower owners to breach the purchase contract with the church by abandoning the purchase contract. The church filed a first amended complaint on February 21, 2023, which removed the cause of action for negligent interference with contract.

The first amended complaint alleged the city, knowing of the existence of the purchase contract, engaged in a series of acts by which the city intended to induce the Tower owners to breach the purchase contract: (1) a December 10, 2020 "Original Zoning Letter" from a city planner to Adventure Church indicating the church could continue to operate the Tower property as it had been following its intended purchase; (2) a January 5, 2021 "Revised Zoning Letter" the city manager sent to the church stating the church could not operate in the Tower Theatre as a religious organization, even as an incidental use, which the church viewed as an attempt to dissuade it from buying the property; (3) in early January 2021, the city approached Terance Frazier to be part of an investment group to purchase the Tower Theatre and sought his advice on how to stop the sale to the church; (4) a January 11, 2021 meeting between city councilmembers Miguel Arias and Esmeralda Soria, Soria's chief of staff Terry Cox, and Abbate regarding the intended sale of the Tower property to the church in which the councilmembers indicated the city may explore eminent domain and zoning issues; (5) a January 27, 2021 letter from Mayor Jerry Dyer to the church asking the church to seek a peaceful resolution to the community uproar over the church's planned purchase of the Tower Theatre and offering another location for the church to meet; (6) at closed session meetings the city

15.

held from January 28, 2021, through February 3, 2021, options to obtain the Tower property were discussed; (7) the city's June 30, 2021 petition for an order to inspect the Tower property for appraisal, which the church believed was filed to intimidate the church and induce termination of the purchase contract; (8) the city's February 2, 2022 letter offering to purchase the Tower property; (9) the April 21, 2022 city council vote to adopt a resolution allowing the city to purchase the Tower property; and (10) the July 22, 2022 close of escrow on the city's purchase of the Tower property.

The interference claim alleged that due to the city's intentional acts, the business relationship between the church and the Tower owners was disrupted as the Tower owners abandoned the purchase contract. The church alleged the city's intentional interference resulted in the following damage to the church: (1) loss of rental income in a monthly amount not less than $9,575 beginning February 2021; (2) loss of income from events in a weekly amount of not less than $4,500 beginning June 2021; (3) $175,000 in rent the church continued to pay; (4) improvements the church made to the Tower Theatre of not less than $300,000; and (5) the cost of relocation and loss of church attendance due to eviction from the property.

### *The Special Motion to Strike*

On April 14, 2023, the city filed a special motion to strike the first cause of action in the first amended complaint, which is the interference claim.[11] The city asserted the interference claim rested almost entirely on the following protected activities within the meaning of the anti-SLAPP law: (1) the city's successful lawsuit for an order permitting an inspection of the Tower Theatre to obtain an appraisal; (2) the city council's compliance with the Brown Act in publishing an agenda item regarding real property

---

[11]     The city earlier filed a demurrer to the first amended complaint on the grounds it failed to state facts sufficient to constitute a cause of action and was uncertain, but the demurrer was never ruled on.

negotiations and holding closed session meetings; (3) the city's privileged settlement communication to resolve the church's threatened litigation against the city for interference with contract; and (4) non-binding letters from city staff interpreting provisions of the Fresno Municipal Code.

The city argued the church could not prevail on its interference claim because it could not establish a viable theory for government liability or prove the required elements for interference with a contract. The city asserted the church could not show government liability because: (1) the church first submitted a claim for damages to the city on May 3, 2022, therefore, any claim that accrued more than one year earlier was barred under Government Code section 911.2; and (2) the city was immune from liability for the December 10, 2020 and January 5, 2021 letters from the city planner and city manager because those employees issued the letters in the exercise of their discretionary authority (Gov. Code, §§ 815.2, subd. (a), 820.2).

The city also argued the church could not prove the required elements of the interference claim. The city contended the church did not have a valid purchase contract as: (1) none of the city's actions from June 30, 2021, through July 22, 2022, could have interfered with the purchase contract because the contract expired on March 31, 2021; (2) the parties were discharged from performing under the purchase contract when the escrow period expired on March 31, 2021, because the Tower owners were unable to provide clear title due to J&A's right of first refusal; (3) the purchase contract was rescinded based on mutual mistake, as both the Tower owners and the church should have known of J&A's right of first refusal before signing the purchase contract, and the Tower owners notified the church the contract was void due to mutual mistake and restored the $15,000 it had been allowed to withdraw from escrow; (4) the doctrine of impossibility resulted in waiving performance, as the Tower owners could not provide

17.

clean title due to J&A's lis pendens; and (5) the church cancelled the purchase contract when it signed escrow cancellation instructions in July 2022.

The city contended it did not intend to interfere with the purchase contract. It asserted that out of the 10 complained-of acts alleged to have occurred before the purchase contract expired on March 31, 2021, only the January 11, 2021 meeting between Abbate and two councilmembers would have been known to the Tower owners, but the outcome of this meeting was that the purchase contract could not be unwound. And while the first amended complaint alleged the city met with Frazier, who advised the city to file a lis pendens or force a zoning change, the city took neither of these actions.

The city next argued its alleged acts did not cause the Tower owners to breach the purchase contract because: (1) it was the church's lawsuit against the Tower owners that caused them to no longer want to sell the Tower property to the church; (2) the church never had sufficient funds to purchase the property; and (3) the Tower owners were not influenced by the city's alleged acts since the Tower owners were committed to selling the Tower property to the church up to the March 31, 2021 deadline, when the purchase contract expired, and the city could not interfere with an expired contract. Finally, the city argued that under the sham pleading rule, the church was bound by the allegation it made in the February 2022 lawsuit against the Tower owners that they breached and repudiated the purchase contract. Therefore, the city's acts after that date could not have caused the Tower owners to breach the contract.

### The Church's Opposition

In opposing the motion, the church argued the interference claim did not arise from protected free speech activities under the anti-SLAPP law. The church asserted the city's motion ignored the " 'gravamen' " of the interference claim, namely, that the city wrongfully induced the Tower owners to breach the purchase contract and instead sell the Tower Theatre to the city, which the city accomplished by tempting the Tower owners

18.

with a compensation package worth close to $2 million more than the purchase contract. The church argued its claim was based on the city officially deciding to make an offer to purchase the Tower property despite knowing the church was actively under contract with the Tower owners, which was not protected free speech as a matter of law. The church asserted whether other conduct constituted protected free speech was irrelevant for an anti-SLAPP determination. The church also argued the city mischaracterized the content of the first amended complaint and the city's own conduct, which did not concern protected first amendment speech.

The church asserted it was more than likely to prevail on its interference claim, as it could prove all elements of such a claim. The church asserted there was a valid contract as: (1) the purchase agreement did not expire on March 31, 2021, because Abbate waived the time for performance, which made his attempted cancellation invalid; (2) there was no mutual mistake regarding J&A's purported right of first refusal as the Tower owners affirmatively represented to the church that there were no options or right of first refusals affecting title to the Tower property and Abbate told the church J&A waived its right to exercise its option; (3) the purported rescission only came after the city's interference; (4) the church agreed to escrow cancellation instructions only after the city's interference with the purchase contract was complete; and (5) it was not impossible to complete performance of the purchase contract, as shown by the city's ability to purchase the property, and it was not settled that the Tower owners could never provide clean title.

The church asserted the city knew of the church's purchase contract, and the Tower owners were selling the Tower property to the church until the city offered indemnification and an extra $2 million. The church asserted our finding in *J&A Mash & Barrel* that Tower Theater Productions was liable for attorney fees and costs related to its attempt to expunge J&A's lis pendens, along with the social pressure from the protests

19.

over the sale, incentivized Abbate to submit to the city's pressure and accept an offer more generous than the church's offer. The church also asserted its lawsuit against the Tower owners was consistent with its current pleadings, as it planned on amending the complaint in that action to include the city as a defendant, but dismissed the action before it could do so.

Finally, the church asserted it timely complied with the Government Claims Act because it filed its complaint within one year of the date the interference claim accrued, which did not occur until the Tower owners' actual breach of the contractual relationship with the church sometime between January and May 2022, when the Tower owners agreed to sell the Tower property to the city.

### *The City's Reply*

In reply, the city argued that if the interference claim was based on the city's offer to purchase the Tower property for $2 million more than the church offered, the city's initial offer to purchase the Tower property was a protected settlement offer to resolve pending litigation and the city council's April 21, 2022 resolution was protected as a statement made in connection with a legislative proceeding. The city further argued the other alleged city actions also were protected under the anti-SLAPP law.

The city contended the church failed to meet its burden of showing a probability of success on the interference claim. The city claimed the alleged acts of interference were privileged under Civil Code section 47. The city argued the church did not make a prima facie showing of a valid contract as: (1) the purchase contract expired on March 31, 2021, or on January 12, 2022, at the latest, and there was no waiver of the time for performance as Abbate could not waive the time for performance on his own, his statements did not show an intention to waive a known right and were made after the contract expired on March 31, 2021, and the parties were working on a new agreement; (2) the city's alleged interference could not have caused the Tower owners' purported

20.

breaches since they occurred before the city made its offers to purchase the property; (3) the purchase contract expired due to nonperformance of mutual conditions; (4) the purchase contract was impossible to perform under its terms; and (5) the purchase contract was rescinded due to mutual mistake.

The city contended the church did not make a prima facie showing that the city intended to or did interfere with the purchase contract or that it could overcome the city's asserted privileges and defenses.

### *The Trial Court's Order After Hearing*

After the trial court issued a tentative decision on the city's motion, a hearing was held, at which both parties appeared and presented argument. The trial court took the matter under submission and subsequently issued an order after hearing granting the motion. The trial court first found that the purchase contract expired on March 31, 2021, so the city could not have interfered with the contract after that date. Therefore, the trial court only addressed the city's actions occurring before that date, which consisted of: (1) the zoning opinion letters; (2) the alleged meeting with Frazier; (3) the January 11, 2021 meeting with councilmembers, staff, and Abbate; (4) the mayor's letter; and (5) the closed session city council meetings. The trial court found the city made a prima facie showing that the interference claim arose from protected activities, as these acts involved writings and speech made in connection with an issue under consideration by an executive or legislative body.

With respect to whether the church could show a probability of prevailing on the interference claim, the trial court first considered whether there was any authority for municipal liability and, if so, whether the church had sufficiently demonstrated intentional interference with a contractual relationship. On the issue of government liability, the trial court found that because the purchase contract expired on March 31, 2021, and the church submitted its claim for damages to the city on May 3, 2022, the

church's claims arising out of the city's conduct occurring between December 7, 2020, and February 3, 2021, were time barred, as the church was required to bring a claim for money damages within one year of accrual of the cause of action. The trial court further found that since these were the only acts that could have constituted interference with a contractual relationship, the church would not be able to demonstrate a likelihood of prevailing on the merits.

The trial court also addressed the city's contention that it was immune from suit under Government Code section 815. The trial court noted that for the first time at oral argument, the church contended the city was vicariously liable for its employee's conduct under Government Code section 815.2.[12] The trial court analyzed the city's acts that occurred before March 31, 2021, and determined: (1) the city was immune with respect to the zoning letters under Government Code section 818.4; (2) with respect to the acts of the elected officials, such as the mayor and city councilmembers, the city could not be held liable on the interference claim unless the elected officials and city were named as codefendants, which was not the case here; and (3) even if elected officials were added before any judgment, their acts involved planning level decisions which made them and the city immune under Government Code sections 815.2 and 820.2.

With respect to whether the church had a probability of prevailing on the merits of its interference claim, the trial court found the church would not be able to demonstrate it had a valid contract or a breach of that contract after March 31, 2021. The trial court explained the purchase contract states time is of the essence and it could only be amended in a writing signed by both parties, and while the parties executed extensions, with the last expiring on March 31, 2021, the church did not show or argue it was extended further

---

**12** The reporter's transcript of the hearing shows the church's counsel raised this argument in response to the trial court's tentative ruling that the church failed to allege a statute that would impose municipal liability on the City.

22.

in writing.  The trial court rejected the church's argument that the Tower owners waived the time for performance, as the ongoing discussions to complete the sale to the church did not indicate the deal set forth in the purchase contract was being kept alive and Abbate's statements to the media only indicated a deal was still in the works or possibly alive.  The trial court therefore found the purchase contract expired on March 31, 2021, which meant the city's acts that occurred after that date could not have interfered with a contractual relationship or caused the Tower owners to breach the contract.

In summary, the trial court found the city met the threshold requirement to show the letters and meetings were protected acts taken in connection with a matter being considered by an executive or legislative body.  The trial court further found the church had not demonstrated a likelihood of prevailing on the merits as:  (1) the purchase contract expired on March 31, 2021; (2) the alleged conduct prior to that date was time-barred because the church did not timely present its claim to the city; (3) even if the claims were not time-barred, each alleged act prior to the expiration of the purchase contract involved planning level decision-making by the executive and legislative bodies or their representatives or employees; and (4) the church could not prevail where it could not demonstrate a valid contract after March 31, 2021, or a breach of contract after that date.

## DISCUSSION

### I.    *Anti-SLAPP Motions and the Standard of Review*

The anti-SLAPP statute authorizes a special motion to strike a "cause of action" "arising from any act … in furtherance of [a] person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue …, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  (§ 425.16, subd. (b)(1).)  The statute dictates a two-step process for resolving an anti-SLAPP motion:  "First, 'the

23.

moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.' [Citation.] Second, for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit." ' " (*Bonni*, *supra*, 11 Cal.5th at p. 1009.) Only a claim that "satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit" will be stricken. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*).)

We review de novo the grant or denial of an anti-SLAPP motion. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).) This includes independently determining, based on our own review of the entire record, "whether any of the acts from which challenged claims arise" are protected under the statute. (*Bonni*, *supra,* 11 Cal.5th at p. 1009; see *Park*, at p. 1067.) In both the first and second steps we consider "the pleadings[] and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2); *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79.) We are also mindful of the directive to broadly construe the anti-SLAPP statute. (§ 425.16, subd. (a).)

## II.     *Protected Activity*

The church's interference claim is based on multiple acts by the city that the church alleges interfered with the purchase contract by causing the Tower owners to breach the contract. Instead of examining all 10 acts to determine whether each one constituted protected activity within the meaning of the anti-SLAPP law, the trial court limited its analysis to those acts that occurred prior to March 31, 2021—the date the trial court determined the purchase contract expired—and found they were protected acts.

On appeal, the church does not challenge the trial court's finding that the city's pre-March 31, 2021 acts are protected activities under section 425.16, subdivision (e)(2), which applies to statements or writings "made in connection with an issue under

24.

consideration or review by a legislative, executive, or judicial body," other than to generally argue its finding is contrary to public policy. The church asserts that if the city is granted anti-SLAPP protection for its own petitioning activity, it will be protected in any case against it since all of its actions are taken in connection with government proceedings. But as the city points out, it does not always act through statements or writings—noncommunicative acts and statements that do not concern a public proceeding or an issue of public importance would not be protected. While the church is concerned that an elected official could obtain anti-SLAPP protection by declaring a given issue is under consideration in an official proceeding, that is not what occurred here. Clearly the sale of the Tower Theatre was a significant issue of public importance and the subject of an official zoning inquiry by the church and several city council meetings. The issues in this litigation clearly were under consideration in legitimate official proceedings. The church does not contend otherwise.

Rather than analyze the city's pre-March 31, 2021 acts, the church asserts that "conduct was incidental to the primary allegations" of the interference claim because it "did not result in breach or disruption of the [purchase contract]." The church urges us to look at the " 'principal thrust or gravamen' of the interference cause of action," which it asserts is the "Interference Offer," and argues that cannot be protected activity because it is illegal as a matter of law.

"A claim arises from protected activity when that activity underlies or forms the basis for the claim." (*Park*, *supra*, 2 Cal.5th at p. 1062.) Our Supreme Court's recent anti-SLAPP decisions counsel lower courts to "take[] a claim-by-claim approach to the anti-SLAPP analysis, rather than attempting to evaluate a cause of action as a whole." (*Bonni*, *supra,* 11 Cal.5th at p. 1010, citing *Baral v. Schnitt* (2016) 1 Cal.5th 376; see *Bonni*, at pp. 1010–1011.) This guidance appeared most recently in the 2021 *Bonni* decision where the high court disapproved the use of a "gravamen approach" to discern

the " 'essence' of a cause of action that encompasses multiple claims." (*Bonni*, at p. 1011.) "Instead, courts should analyze each claim for relief—each act or set of acts supplying a basis for relief …—to determine whether the acts are protected …." (*Id.* at p. 1010.)

The first-prong analysis proceeds in two parts. Courts must initially " 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' " (*Bonni*, *supra*, 11 Cal.5th at p. 1009, quoting *Park*, *supra*, 2 Cal.5th at p. 1063.) "Courts then must evaluate whether the defendant has shown any of these actions fall within one or more of the four categories of ' "act[s]" ' protected by the anti-SLAPP statute." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884; see § 425.16, subd. (e).) The Supreme Court has consistently instructed our twin foci must be: (1) "what 'the defendant's activity [is] that gives rise to his or her asserted liability,' " and (2) " 'whether that activity constitutes protected speech or petitioning.' " (*Park*, at p. 1063, quoting *Navellier*, *supra*, 29 Cal.4th at p. 92.)

"Under *Bonni*, it is still appropriate to consider the gravamen of a claim to determine whether the protected conduct identified by the moving party supplies an element of the claim or is merely incidental." (*Pech v. Doniger* (2022) 75 Cal.App.5th 443, 462, fn. 3.) But, as courts have recognized even before *Bonni*, "[t]he concepts of 'principal thrust' and 'gravamen,' … may be too indefinite and abstract to provide a clear rule with predictable results." (*Old Republic Construction Program Group v. The Boccardo Law Firm, Inc.* (2014) 230 Cal.App.4th 859, 868.) This is the clearer rule: a claim "can only be said to arise from protected conduct if it alleges at least one *wrongful* act—conduct allegedly *breaching a duty and thereby injuring the plaintiff*—that falls within [section 425.16]'s definition of protected conduct." (*Id.* at p. 869; see *Wong v. Wong* (2019) 43 Cal.App.5th 358, 365 [adopting this rule].) " 'If the core injury-

producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity,' " anti-SLAPP protection does not apply. (*Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 594.)

Beginning with the first inquiry, the elements of a claim for intentional interference with contractual relations are: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." (*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1148.) The issue of contention is the second inquiry—" 'what actions by [the city] supply those elements and consequently form the basis for liability.' " (*Bonni*, *supra*, 11 Cal.5th at p. 1009.)

The church asserts that while the city engaged in multiple acts of "attempted interference" as alleged in the first amended complaint, the act that supplies the fourth element—the intentional act that caused the actual breach of the church's contractual relationship with the Tower owners—is the "Interference Offer." The church explains that while the city began its attempts to interfere with the contract in 2021, the actual breach of the purchase contract did not occur until 2022, when the Tower owners agreed to sell the Tower property to the city in response to the city's interference offer.

The church, however, does not define the term "Interference Offer." The first amended complaint alleges the city made a written offer to the Tower owners to purchase the Tower property on February 2, 2022; but on appeal, the church asserts the Tower owners declined this offer and thus that offer did not cause the breach. The first amended complaint next alleges the city interfered when the city council voted to adopt the April 21, 2022 resolution that would allow the city to enter into a purchase agreement with the Tower owners. If the church's claim is that the Tower owners breached the purchase

27.

contract by accepting the city's offer, that could only have occurred because of the city council's vote to adopt the resolution.

The city asserts the interference offer must be the city council vote to adopt the resolution, as the first amended complaint does not allege an offer was made or transmitted to the Tower owners. Therefore, the city argues, the interference claim cannot be based on the offer being made to the Tower owners as opposed to the vote approving the offer. While the church responds it alleged an offer was made, the first amended complaint lacks any such allegation. The church asserts it could not allege transmission of an offer because it was not privy to those facts and the only information available to it was that the city "made numerous interference attempts for a year and a half, adopted a resolution to enter into the agreement, and then subsequently [the city] and the Tower Owners closed on the property (i.e. the Tower Owners breached the [purchase contract])." The church also asserts it does not know when the city's attempts to interfere with the purchase contract were successful and induced the Tower owners to breach the purchase agreement.

It does not matter whether the interference claim is based on the February 2022 offer letter, the April 2022 city council resolution, or some unspecified offer by the city that occurred either prior to, or after, the resolution, because communications concerning an offer to purchase the Tower property and the city council's vote adopting the resolution are both protected acts within the meaning of the anti-SLAPP statute.[13] Section 425.16, subdivision (e) expressly defines an " 'act in furtherance of a person's right of petition or free speech' " to include "any written or oral statement or writing

---

[13]     While the first amended complaint also alleges the July 2022 closing of escrow as an act of interference, the city correctly points out that the interference claim cannot be based on that act since the church asserts the Tower owners breached the purchase contract by accepting the city's offer to purchase the Tower property, which occurred before escrow closed. The church does not contend otherwise.

28.

made before a legislative, executive, or judicial proceeding …" and "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body …."  (§ 425.16, subd. (e)(1) & (2).)

The February 2022 offer letter from the city's outside counsel to the Tower owners' attorney was a settlement offer, as the letter states the offer was being extended pursuant to Evidence Code section 1152[14] and references the city's suit against the Tower owners.  Settlement negotiations while a suit is pending are protected for purposes of the anti-SLAPP statute because they "involve communications in connection with a matter pending before or under consideration by an official body, and so fall within the scope of section 426.16, subdivision (e)(2).  (*Bonni*, *supra*, 11 Cal.5th at p. 1024.)[15]

The city council's April 2022 vote to adopt the resolution allowing the city to offer $6.5 million to purchase the Tower property also is protected activity.  Councilmember's votes, as well as statements made during deliberations at the city council meeting where the votes are taken, qualify as "any written or oral statement or writing made before a legislative … proceeding" under section 425.16, subdivision (e)(1).  (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 422–423.)

Finally, any statements and writings made by the city in negotiating a contract to purchase the Tower property, including offers made to the Tower owners, qualify as " 'any written or oral statement or writing made in connection with an issue under

---

**14**　Evidence Code section 1152, subdivision (a), provides that compromise offers are inadmissible to prove liability.

**15**　Similarly, claims that arise out of the filing of a lawsuit arise from protected activity for purposes of the anti-SLAPP statute, as "[t]he filing of a lawsuit is an exercise of the First Amendment right to petition the government."  (*Bonni*, *supra*, 11 Cal.5th at p. 1024.)  Therefore, the city's filing of the lawsuit to obtain a court order to permit an inspection of the Tower Theatre is protected activity.

consideration or review by a legislative … body' " under section 426.16, subdivision (e)(2).  (*City of Montebello v. Vasquez, supra*, 1 Cal.5th at p. 423.)

The church contends the city's offer to purchase the Tower property is not protected activity because it is illegal as a matter of law.  Due to the important interests the anti-SLAPP statute seeks to protect, the Legislature commands that it be construed broadly.  (§ 425.16, subd. (a); *Flickinger v. Finwall* (2022) 85 Cal.App.5th 822, 832.)  Yet, "not all speech or petition activity is protected by section 425.16."  (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 313.)  As relevant here, section 425.16 does not protect "speech or petition activity [that is] illegal as a matter of law."  (*Flatley*, at p. 320.)  This exception applies only in "narrow circumstance[s]" where "either the defendant concedes … or the illegality is conclusively shown by the evidence" to be illegal as a matter of law. (*Id.* at p. 316.)

This exception, however, "requires *criminal* conduct, not a mere violation of court rules or statutes."  (*RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co., Inc.* (2020) 56 Cal.App.5th 413, 427, fn. 9 [illegality exception inapplicable to filing duplicative mechanic's liens; although conduct may be statutorily unauthorized, it is not criminal]; *G.R. v. Intelligator* (2010) 185 Cal.App.4th 606, 616 [illegality exception inapplicable to failure to redact personal identifiers from credit reports in violation of California Rules of Court, as that is not criminal activity]; *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1654 [use of phrase "illegal" in *Flatley* intended to mean criminal not just violative of statute].)

Here, the church asserts the city engaged in illegal conduct by allegedly interfering with the church's contractual relationship with the Tower owners.  But the cases the church cites address another tort—intentional interference with prospective economic advantage—and hold that independently wrongful conduct is required to establish the tort.  (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393

[defendant's conduct must be "wrongful by some legal measure other than the fact of interference itself"]; *Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 1257 [plaintiff has the burden of proving the defendant's conduct was independently wrongful].) To the extent these cases apply to a claim for interference with contractual relationship,[16] the city's conduct must be independently wrongful. But extending a settlement offer, making an offer to purchase property, or adopting a resolution to enter into a real estate purchase contract, are not independently wrongful. More importantly, they are not criminal acts. Accordingly, the illegality exception does not apply here.

In sum, the city satisfied its burden of showing its alleged conduct on which the interference claims is based arose from protected speech or petitioning.

### III.  *Probability of Prevailing*

Since the interference claim arose from protected activity, we proceed to the second step where the church must demonstrate a probability of prevailing on the claim, meaning the claim has "at least 'minimal merit.' " (*Park*, *supra*, 2 Cal.5th at p. 1061.) "In order to establish a probability of prevailing on the claim (§ 425.16, subd. (b)(1)), a plaintiff responding to an anti-SLAPP motion must ' "state[] and substantiate[] a legally sufficient claim." ' [Citations.] Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.)

---

**16**　　In a concurring opinion in *Della Penna*, Justice Mosk stated he would find the tort of intentional interference with prospective economic advantage "requires objective, and unlawful, conduct or consequences." (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, *supra*, 11 Cal.4th at p. 408 [conc. opn. of Mosk, J.].) Justice Mosk, however, did not address whether such a requirement applied to the related tort of intentional interference of contract, although he noted an argument could be made that this requirement should not apply to that tort. (*Id.* at p. 408, fn. 9 [conc. opn. of Mosk, J.].)

31.

The plaintiff must demonstrate this probability of success with admissible evidence. (*Sheley v. Harrop* (2017) 9 Cal.App.5th 1147, 1162; *City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214 Cal.App.4th 358, 376 [a " 'plaintiff may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence' "].) Neither the trial nor the appellate court weighs credibility or compares the weight of the evidence. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.) "Rather, the court's responsibility is to accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.)

As set forth above, a claim for interference with a contractual relationship requires the existence of a valid contract. (*Reeves v. Hanlon*, *supra*, 33 Cal.4th at p. 1148.) In addressing this element, the church concedes the March 31, 2021 deadline to close escrow as stated in the eighth amendment to the purchase contract elapsed without further written extension or amendment. The church, however, contends it is clear from Abbate's conduct on behalf of the Tower owners that they expressly and impliedly waived any time for performance.

In a contract for the sale of real property, the buyer's obligation to deposit the purchase price into escrow within the time specified in the contract, and the contract's provision that time is of the essence, are as binding on the buyer as the promise to convey the land is on the seller. (*Galdjie v. Darwish* (2003) 113 Cal.App.4th 1331, 1337–1338 (*Galdjie*); *Pitt v. Mallalieu* (1948) 85 Cal.App.2d 77, 81.) "Thus, where the parties have made time the essence of the contract, at the expiration of time without tender by either party, both parties are discharged." (*Pittman v. Canham* (1992) 2 Cal.App.4th 556, 560.) In this circumstance, a buyer's failure to pay the money within the specified time

deprives it of the right to enforce performance of the seller, who holds the privilege of terminating the sale contract. (*Pitt*, at p. 81.)

A contract's timeliness provision, however, may be waived by the party for whose benefit it was made. (*Galdjie*, *supra*, 113 Cal.App.4th at p. 1339.) " 'Waiver is the intentional relinquishment of a known right after full knowledge of the facts and depends upon the intention of one party only. Waiver does not require any act or conduct by the other party.' [Citation.] Thus, '[t]he *pivotal* issue in a claim of waiver is the intention of the party who allegedly relinquished the known legal right.' " (*Old Republic Ins. Co. v. FSR Brokerage, Inc.* (2000) 80 Cal.App.4th 666, 678.) The party claiming waiver has the burden of proving it by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases are decided against waiver. (*Ibid.*) Even if a party waives the time for performance, it may reinstate the time conditions by giving definite notice to the other party. (*Gonzalez v. Hirose* (1948) 33 Cal.2d 213, 216.)

Waiver may be "either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31.) Courts generally find waiver when a party intentionally relinquishes a right or the party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that he or she has relinquished the right. (*Id.* at pp. 33–34.) While the existence of waiver is usually a question of fact, the trial court may resolve the issue as a question of law when the underlying facts are undisputed. (*Old Republic Ins. Co. v. FSR Brokerage, Inc.*, *supra*, 80 Cal.App.4th at p. 679.)

The church relies on *Galdjie* to support its argument that the Tower owners waived the time for performance. There, the parties entered into a purchase agreement related to an apartment building and set an April 9 deadline to close escrow. (*Galdjie*, *supra*, 113 Cal.App.4th at p. 1334.) Like the present case, the purchase agreement

33.

contained a time is of the essence provision and mandated that extensions or modifications of the agreement be in writing. (*Ibid.*) On April 1, one of the sellers informed the buyer in writing that the contract would not be extended beyond April 9, but escrow did not close by that date. (*Ibid.*) Between April 9 and mid-May, the buyer and one of the sellers were in constant communication and the buyer advised that seller of his efforts to obtain a loan. (*Id.* at p. 1336.) That seller communicated her approval of the buyer's efforts, orally agreed to extend escrow beyond April 9, told the buyer to call the escrow company and have the escrow extended, and as of May 8, she continued to cooperate and encourage the buyer to go forward with the transaction. (*Id.* at pp. 1336–1337.) On May 13, however, the sellers requested cancellation of escrow on the basis that escrow did not close on time. (*Id.* at pp. 1334–1335, 1337.) The trial court determined the sellers' conduct after April 9 evidenced a waiver of the escrow deadline and awarded the buyer specific performance. (*Id.* at pp. 1336–1337, 1340.)

The Court of Appeal affirmed the judgment after rejecting the sellers' argument that the purchase agreement automatically terminated on April 9. (*Galdjie*, *supra*, 113 Cal.App.4th at pp. 1340–1342.) The appellate court explained there was no basis to overturn the judgment, as the trial court found the sellers waived the time provisions by continuing to deal with the buyer after the dates specified in the contract and the seller's statement that time would not be extended past April 9 was contradicted by her actions of staying in communication with the buyer and approving and assisting his efforts to locate a willing lender. (*Id.* at pp. 1340, 1342.) The trial court further found that by the time the sellers notified the escrow holder of their desire to cancel without reestablishing time conditions, the buyer had tendered the loan approval letter, and the buyer's failure to tender the loan funds was due to the seller's failure to put the termite report into escrow. (*Ibid.*)

Here, the evidence does not indicate the Tower owners intended to relinquish their right to enforce the March 31, 2021 deadline for performance.  The day before that deadline, the Tower owners' attorney asked the church's attorney to confirm that the church would sign the escrow instruction to cancel the escrow and when the church apparently declined to do so, advised the church's attorney that the escrow would not close the following day, the Tower owners would not extend the escrow deadline, and it was the church's choice if it wanted to leave its money sitting in escrow.  On March 31, 2021, Richardson e-mailed Abbate with three options, one of which involved winning the appeal in the J&A action and continuing with the "current escrow," and the other two involved cancelling the escrow and either the church purchasing shares in the entity that owned the property or entering into a new agreement to buy the Tower Theatre.

After the deadline passed, the Tower owners' position was that the purchase contract had expired, as stated in their attorney's e-mail from the end of April 2021. Nevertheless, they remained willing to sell the Tower Theatre to the church on new terms that became necessary due to J&A's lawsuit.  Those terms included moving to expunge J&A's lis pendens, subdividing the Tower property, terminating "the current contract and escrow, with both parties releasing all claims related to the current contract and escrow," signing a new contract selling the Tower Theatre to the church once the subdivision is complete, and providing "the current full purchase agreement" to the brewery and informing them the property was being subdivided and giving them "one last chance to take the deal at the appraised value once the subdivision is done."

To that end, the Tower owners and the church left the purchase contract and escrow open, which the parties intended to use for negotiation purposes and to maintain leverage with the expectation that the contract would be cancelled in exchange for a new deal.  The parties recognized that the new deal could be accomplished by either amending the terms of the purchase contract and escrow or entering into a new agreement and

35.

escrow.  Either way, however, the Tower property would need to be subdivided, with the church buying only the Tower Theatre and pizza restaurant parcels.

The Tower owners, however, did not intend to keep the escrow open so the terms of the purchase contract could be fulfilled or agree to an extension of the purchase contract.  Rather, both parties understood the purchase contract could not be complied with as written as it did not include J&A, which wanted to exercise its right of first refusal on the brewery premises.  This is not a situation, as in *Galdjie*, where the seller assisted the buyer with completing the buyer's obligations under the purchase agreement after the deadline for performance passed.  Instead, the Tower owners worked with the church to fight J&A's claimed right to a portion of the property and establish a new agreement to address that claim with a new deadline for performance.  Continuing to negotiate with the church to address a circumstance not contemplated in the purchase contract did not result in a waiver of the right to cancel the purchase contract for the church's nonperformance since there is no indication the agreement as specified in the purchase contract remained open and viable.

While moving to expunge the lis pendens would have helped the church obtain funding to complete the purchase, the expungement was part of a plan to enter into a new agreement on different terms, including subdividing the Tower property, not to complete the purchase contract as written.  That the parties might accomplish this by amending the purchase contract, rather than terminating the contract and closing escrow, does not mean the Tower owners waived the time for performance under the purchase contract.  Moreover, the Tower owners did not cancel the purchase contract after the church satisfied the contingencies.  Instead, the church did not tender the money necessary to close the purchase and was not able to do so because the lis pendens precluded the church from obtaining funding.  This distinguishes the present case from *Galdjie*, where the

36.

seller assisted the buyer's efforts to locate a lender and then cancelled escrow just as the buyer obtained a firm loan commitment. (*Galdjie*, *supra*, 113 Cal.App.4th at p. 1340.)

The church asserts the Tower owners believed the purchase contract remained operative because their attorney used the term "current contract and escrow," rather than expired contract and escrow, in his late-April 2021 e-mail. In the same e-mail, however, the attorney asserted the purchase contract had "expired." When read together, the attorney used the term "current contract and escrow" simply to distinguish the prior contract from the proposed new one. There is nothing in the e-mail to indicate the agreement as set forth in the purchase contract remained operative.

The church also relies on Abbate's statements to the media in April 2021, which it argues show he intended to waive the time for performance. When read in context, Abbate's statements show that he understood the contract was expired and the escrow had ended, but he still wanted to sell the property to the church, he believed the sale was put on hold as the legal proceedings played out, and they were trying to figure out an alternate path. While Abbate believed they were "in the contract," he recognized it was a "gray area" that he would leave to the attorneys, although he also stated he had to "legally stay with them" and it was "the right thing and legal." Rather than stating that the purchase contract remained in effect, Abbate's statements are consistent with the position that the Tower owners had taken with respect to the purchase contract and escrow—that both had expired but they were willing to negotiate a new contract to complete the sale. That Abbate may have believed he had a legal obligation to sell the Tower property to the church does not mean that he expressly waived the right to declare the purchase contract terminated based on the church's failure to perform.

The church also argues the Tower owners' retention of the $15,000 of the church's deposit that was released to the Tower owners in March 2021 for more than a year indicates they considered the purchase contract to be operative since the $15,000 was to

37.

be applied to the purchase price. But the amendment that authorized the release of the funds specifically stated they were nonrefundable. Accordingly, the Tower owners' retention of those funds does not indicate they intended to waive the time for performance or considered the purchase contract to be operative.[17]

In sum, the evidence shows that the Tower owners did not waive the March 31, 2021 deadline for performance. Instead, they negotiated with the church for a new contract that would address J&A's asserted right to purchase the brewery premises—to subdivide the property and sell only the Tower Theatre and pizza restaurant parcels to the church. Thus, the Tower owners did not act inconsistently with the intent to enforce their right to cancel the purchase contract such that one would reasonably believe they had relinquished that right. Since the Tower owners did not waive the time for performance, the purchase contract expired on March 31, 2021. As such, the church cannot establish a valid contract after that date. The church asserts the city induced the Tower owners to breach the purchase contract in 2022. But because the purchase contract had expired, the city could not intentionally interfere with the purchase contract. Accordingly, the church cannot establish a probability that it will prevail on its interference claim and the trial court did not err granting the city's special motion to strike.[18]

---

[17] The church points out that the Tower owners eventually returned the $15,000 through the city after they purported to rescind the purchase contract and cancelled the escrow. Even if the purported rescission were ineffective, as the church argues, the fact remains that the Tower owners' retention of the money did not show they considered the purchase contract to be operative, as they were permitted to retain the funds even if escrow did not close.

[18] Since we have found that the church cannot prevail on the interference claim because the purchase contract expired on March 31, 2021, we do not address the other issues the parties raise, including governmental immunity, impossibility, rescission, and the timeliness of the claim presented to the city under the Government Claims Act.

## **DISPOSITION**

The trial court's June 12, 2023 order is affirmed.  Costs on appeal are awarded to respondent.


DE SANTOS, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


SMITH, J.